**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Daniel Nugent, | No. CV-22-01763-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Commissioner of Social Security Administration, | |
| Defendant. | |

Plaintiff challenges the denial of his applications for benefits under the Social Security Act ("the Act") by the Commissioner of the Social Security Administration ("Commissioner"). The Court has reviewed Plaintiff's opening brief (Doc. 11), the Commissioner's answering brief (Doc. 17), and Plaintiff's reply (Doc. 18), as well as the Administrative Record (Doc. 9, "AR"), and now affirms the Administrative Law Judge's ("ALJ") decision.

I.     Procedural History

On March 15, 2016, Plaintiff filed applications for disability and disability insurance benefits, alleging disability beginning on May 1, 2006. (AR at 16.) The Social Security Administration ("SSA") denied Plaintiff's applications at the initial and reconsideration levels of administrative review and Plaintiff requested a hearing before an ALJ. (*Id.*) On November 20, 2018, following a hearing, the ALJ issued an unfavorable decision. (*Id.* at 16-27.) After the Appeals Council denied review (*id.* at 1-3), Plaintiff appealed to this Court.

1    On March 4, 2021, Judge Ferraro issued an order vacating the ALJ's decision and
2    remanding for further proceedings. *Nugent v. Comm'r of SSA*, 2021 WL 824414 (D. Ariz.
3    2021). Judge Ferraro concluded that the ALJ provided legally insufficient reasons for
4    discrediting the opinions of a consultative examiner, Dr. Christiansen. *Id.* at *4-6. Given
5    this determination, Judge Ferraro declined to resolve Plaintiff's additional argument that
6    "the ALJ improperly rejected [Plaintiff's] testimony" but clarified that, on remand, "[t]he
7    ALJ may consider [Plaintiff's] argument or reevaluate [Plaintiff's] testimony." *Id.* at *6.

8    On September 28, 2021, the ALJ held another telephonic hearing. (AR at 841.)
9    During the post-remand proceedings, Plaintiff amended the alleged onset date to June 20,
10   2012. (*Id.*) On October 14, 2021, the ALJ issued another unfavorable decision. (*Id.* at
11   841-54.) The Appeals Council later denied review. (*Id.* at 831-34.)

12   II.    The Sequential Evaluation Process And Judicial Review

13   To determine whether a claimant is disabled for purposes of the Act, the ALJ
14   follows a five-step process. 20 C.F.R. § 404.1520(a). The claimant bears the burden of
15   proof on the first four steps, but the burden shifts to the Commissioner at step five. *Tackett*
16   *v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). At the first step, the ALJ determines whether
17   the claimant is presently engaging in substantial gainful activity. 20 C.F.R.
18   § 404.1520(a)(4)(i). At step two, the ALJ determines whether the claimant has a "severe"
19   medically determinable physical or mental impairment. 20 C.F.R. § 404.1520(a)(4)(ii). At
20   step three, the ALJ considers whether the claimant's impairment or combination of
21   impairments meets or medically equals an impairment listed in Appendix 1 to Subpart P
22   of 20 C.F.R. Part 404. 20 C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is automatically
23   found to be disabled. *Id.* At step four, the ALJ assesses the claimant's residual functional
24   capacity ("RFC") and determines whether the claimant is capable of performing past
25   relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If not, the ALJ proceeds to the fifth and
26   final step, where she determines whether the claimant can perform any other work in the
27   national economy based on the claimant's RFC, age, education, and work experience. 20
28   C.F.R. § 404.1520(a)(4)(v). If not, the claimant is disabled. *Id.*

An ALJ's factual findings "shall be conclusive if supported by substantial evidence." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1153 (2019). The Court may set aside the Commissioner's disability determination only if it is not supported by substantial evidence or is based on legal error. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). Substantial evidence is relevant evidence that a reasonable person might accept as adequate to support a conclusion considering the record as a whole. *Id.* Generally, "[w]here the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (citations omitted). In determining whether to reverse an ALJ's decision, the district court reviews only those issues raised by the party challenging the decision. *Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001).

III.     The ALJ's Decision

The ALJ found that Plaintiff met the insured status requirements of the Act through December 31, 2012 and had not engaged in substantial, gainful work activity since the original alleged onset date of May 1, 2006. (AR at 843.) Next, the ALJ found that Plaintiff had the following severe impairments: "right shoulder dysfunction, status post multiple surgeries, knee degenerative joint disease, anxiety disorder, depressive disorder, personality disorder." (*Id.* at 844.)[1] Next, the ALJ concluded that Plaintiff's impairments did not meet or medically equal a listing. (*Id.* at 844-46.) Next, the ALJ calculated Plaintiff's RFC as follows:

> [T]he claimant has the residual functional capacity to perform a range of light work, that is lift carry 20 pounds occasionally, 10 pounds frequently. With all manipulative limitations to the right upper extremity limited to the 10-pound limit as a maximum. The claimant has no stand/walk limits. He has no sitting limitation. Push/pull on the left is no limit and, on the right, 10 pounds maximum occasional, less than 10 pounds frequent, nothing continuous. No limits for ramps, stairs. Never climb ladders, ropes, scaffolds, or crawl. Kneel, stoop frequent. Manipulative limits are no limits for the left upper extremity. The claimant is right hand dominant. Overhead reaching with the right is never. Reaching all other directions, maximum of

[1]     The ALJ also noted that Plaintiff had undergone treatment for chronic obstructive pulmonary disease but concluded that this condition was "nonsevere." (AR at 844.)

10 pounds occasional, less than 10 pounds frequent.  Gross manipulation and fine manipulation, left no limit, right 10 pounds occasional and less than 10 pounds frequent.  No limits on feeling.  No unprotected heights or moving machinery.  Work should be limited to simple repetitive work with few changes, no teamwork, no work involving the safety of others, public contact limited to no more than occasional, brief, superficial, and not a primary component of the job.  Coworker involvement is only occasional.  Supervisor contact is occasional.

(*Id.* at 847.)

As part of this RFC determination, the ALJ evaluated Plaintiff's symptom testimony, concluding that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision."  (*Id.* at 848.)  The ALJ also evaluated opinion evidence from various medical sources, concluding as follows: (1) consultative examiner and neurologist Greg Hunter, M.D. ("given significant weight"); (2) state agency medical consultants ("given significant weight"); (3) consultative examiner Michael Christiansen, Ph.D. ("given some weight"); and (4) state agency psychological consultants ("given limited weight").  (*Id.* at 851-52.)

Based on the testimony of a vocational expert, the ALJ concluded that although Plaintiff could not perform his past relevant work as a lubrication servicer or construction worker I, Plaintiff was able to perform other jobs that exist in significant numbers in the national economy, including cleaner, collator operator, and inspector.  (*Id.* at 852-54.)  Thus, the ALJ concluded that Plaintiff is not disabled.  (*Id.* at 854.)

IV.     Discussion

Plaintiff presents only one issues on appeal—whether the ALJ improperly discredited his symptom testimony.  (Doc. 11 at 2.)  As a remedy, Plaintiff seeks a "remand for reconsideration of the evidence."  (*Id.* at 11.)

…

- 4 -

A.   **Symptom Testimony**

1.   Standard Of Review

An ALJ must evaluate whether the claimant has presented objective medical evidence of an impairment that "could reasonably be expected to produce the pain or symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007) (citations omitted). If so, "an ALJ may not reject a claimant's subjective complaints based solely on a lack of medical evidence to fully corroborate the alleged severity of pain." *Burch v. Barnhart*, 400 F.3d 676, 682 (9th Cir. 2005). Instead, the ALJ may "reject the claimant's testimony about the severity of [the] symptoms" only by "providing specific, clear, and convincing reasons for doing so." *Brown-Hunter v. Colvin*, 806 F.3d 487, 488-89 (9th Cir. 2015). In this analysis, the ALJ may look to "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (citation omitted).

2.   The ALJ's Evaluation Of Plaintiff's Symptom Testimony

The ALJ's lengthy, 11-paragraph rationale for not fully crediting Plaintiff's symptom testimony was as follows:

> As for the claimant's statements about the intensity, persistence, and limiting effects of his symptoms, they are inconsistent because the allegations are not fully supported by objective or opinion evidence. The claimant's daily activities, symptoms, aggravating factors, treatment modalities, and possible side effects have been considered. For example, there was a conflict in the claimant's report to La Frontera of auditory hallucinations and the claimant's denial of same to a consultative examiner. Treatment notes consistently reported that the claimant had no focal neurologic deficits. Despite his complaints of shoulder pain, as of December 2020 and early 2021, the claimant was getting along with coworkers in his job as a tree climber.
>
> In term of shoulder dysfunction, the claimant's surgical history is significant for right shoulder SLAP repair and acromioplasty in or about 2013-2014. As

- 5 -

of early 2015, the claimant reported that pain had not improved with multiple cortisone shots or surgery.  Imaging at that time showed a SLAP tear type II for which the claimant underwent arthroscopy.  The claimant reported the surgery relieved his pain.  Exam showed full range of motion, no weakness, and no limitations.  In 2016, the claimant was provided pain medication for the right shoulder through his primary care provider.  Medication included morphine sulfate and oxycodone, as well as tizanidine for muscle tension. Right shoulder range of motion was unchanged with range to front part of his body, reaching over to touch left shoulder and limited to the back of the neck.  There was tenderness of paracervical muscles.  These finding were reportedly unchanged from December 2015.  There were no neurologic deficits.  The claimant's pain was controlled, and he was able to carry on with activities of daily living reasonably well.  There was no evidence of impairment or excessive drowsiness with medication.  The claimant had normal strength, reflexes, and gait in late 2016.  He received a right shoulder injection.  In March 2017, the claimant was working and had increased activity with the shoulder.  He was unable to take morphine due to drug testing.  On exam, there was full range of motion of the right shoulder with some discomfort.  There were no focal neurologic deficits.

In early 2018, the claimant again complained of right shoulder pain with decreased range of motion and positive impingement sign when seen by an orthopedist. Motor and sensory exams were otherwise intact bilaterally. X-rays were normal.  Imaging showed mild bursal surface fraying of the supraspinatus tendon at the greater tuberosity insertion without evidence of high-grade partial or full-thickness tear of the rotator cuff tendons.  There was no evidence of recurrent tear or detachment of the glenoid labrum.  There was mild to moderate scarring of the glenohumeral joint capsule, with no edema of the joint capsule identified.  There was mild age-appropriate thinning of glenohumeral joint articular cartilage.  Exam of the right shoulder revealed good range of motion, mild impingement, positive pain over the AC joint.

The claimant elected to undergo right shoulder arthroscopy, arthroscopic acromioplasty, and distal clavicle excision in June 2018.  The claimant reported to his primary care provider the following month that surgery had not improved his shoulder dysfunction.  He was unable to lift even a gallon of milk due to weakness.  On exam, there was decreased range of motion of the neck and with right shoulder abduction. There was mild weakness of grip with the right hand.  The claimant was given trigger point injections for shoulder pain in mid and latter 2018.  It appears the claimant continued pain management with his primary care provider, although there are no more recent treatment notes.

The claimant reported right knee pain in mid-2017. X-rays were benign. The claimant was advised to take anti-inflammatories and would be seen on an as-needed basis. He had a history of left knee surgery. The claimant was working in early 2017 and reported that he injured the knee at work while walking. He was wearing a knee brace. Primary care notes indicated that knee pain was stable in early 2018 following an injection. The claimant was full weight bearing with no joint redness, swelling, or heat. There were no focal neurologic deficits. Mental health notes in early 2021 indicate that the claimant did not have a primary care provider at that time. He had last been seen in September 2018.

The claimant's physical impairments require exertional, postural, manipulative and environmental limitations. For example, the claimant's ongoing right shoulder pain and surgical history limit lifting, carrying, pushing, pulling, and manipulative activities. Hazard precautions address potential medication side effects, pain, and reports of decreased range of motion. However, the claimant's lack of neurologic deficits indicate that he still is capable of light exertion, use of ramps and stairs, and frequent kneeling and stooping.

In terms of mental impairments, the claimant established care with La Frontera Arizona (La Frontera) in mid-2015 due to a domestic violence case and probation. Treatment notes end in January 2016 with the claimant seeking letters to have a pit bull certified as a companion animal. The claimant denied prior treatment as an adult. There was Child Protective Services involvement with one of the claimant's children in mid-2015. The teenager was removed from the home. The claimant reported being unable to work due to stress. He was being supported by his fiancée. However, the claimant reported to a consultative examiner that his "wife" did not work either and they survived on his son's Social Security payments. La Frontera diagnoses were unspecified drinking behavior, generalized anxiety disorder, depressive disorder, not otherwise specified, and PTSD from physical and mental abuse by his father as a child. The claimant reported having mood swings, racing thoughts, depression, flashbacks, night terrors, panic attacks, and auditory hallucinations of his father's voice. However, the claimant denied any history of hearing or seeing things other people did not during a consultative examination in September 2016, the same period in which he obtained medical management through La Frontera. La Frontera notes end in 2016.

Primary care notes in April 2018 indicated that the claimant was no longer with La Frontera and was no longer on behavioral health medication. He

requested medication for insomnia.  This break in treatment does not support the alleged disabling mental health symptoms as the claimant only began treatment as part of his probation.  Subsequent behavioral health treatment was through Marana Health Care.  Diagnosis was paranoid personality disorder.  Marana Health Care behavioral health visits appear to have begun in early 2020.  Chief complaint was anxiety.  The claimant was living with his girlfriend, with whom he had a good relationship, and their two children.  His girlfriend had two other children also living with them.  The claimant reported that his employment had been inconsistent, and he had a difficult time getting along with others.  He was still working.  Mood was anxious.  Nightmares were under good control.  The claimant was irritable.  Diagnoses were PTSD and alcohol abuse.  The claimant reported a history of four domestic violence charges in the past four years.  In July 2020, the claimant presented as euthymic.  He reported anxiety due to trying to move agencies.  At that time, he had not spoken to his children in 9 weeks.  He was pressure-washing trucks every other weekend.  He had no nightmares but was angry.  The claimant's cluster of symptoms were found to be consistent with paranoid personality disorder as diagnosed by a psychiatrist.  He was seen the following month for medication management.  He had not seen his children in 16 weeks, but the reason for this was not reported.  Nevertheless, the claimant's mood was euthymic.  The claimant was well groomed and cooperative.  Attention/concentration was good, as was eye contact and impulse control.  The claimant had started a new job, which he enjoyed.  He had no paranoid thoughts.  Diagnosis was paranoid personality disorder.

Subsequent diagnoses also included major depressive disorder and generalized anxiety disorder when the claimant underwent an evaluation with an intake specialist in August 2020.  Several months later, the claimant reported that he was homeless.  There was a restraining order against him, but no details were reported.  The claimant was assessed as improved despite negative rumination and anxious mood.  The claimant reported that he was no longer homeless in December 2020.  Mood was euthymic.  Irritability was under good control and depression had improved.  The claimant was getting along with coworkers in his job as a tree climber.

As of early 2021, the claimant's symptoms were well managed.  Medications included trazadone for sleep, sertraline for anxiety, Depakote, and prazosin for nightmares.  The claimant was back with his four children and his girlfriend.  The claimant continued to work as a tree climber.  Mental status exam noted that the claimant was well groomed and cooperative with good eye contact. His mood was anxious.  Speech was normal and thought process was intact.   Thought content was coherent and vigilant. Attention/concentration was good.  Insight and judgment were intact.

Impulse control was good. There were no vegetative signs. The claimant had some hypervigilance but no paranoia. There was no mood instability, and irritability was under good control. The claimant also denied medication side effects. Sleep was good. In May 2021, the claimant was still with his girlfriend, with whom he had a good relationship, and four children. He had no nightmares. He was still working as a tree cutter. Mood was euthymic. The claimant was not working in August 2021 and was living off savings, but his girlfriend was working. He reported some irritability but no nightmares. Mood was irritable and anxious. The claimant coped by limiting stress.

The residual functional capacity accounts for the claimant's reported social discomfort, memory complaints, concentration complaints and other symptoms by limiting him to work that is simple and repetitive involving limited social interaction in the workplace. It is noted, however, that mental status exams have reported intact memory, generally good concentration, and generally intact insight and judgment.

(*Id.* at 848-51, record citations omitted.)

### 3. The Parties' Arguments

Plaintiff argues that the "ALJ failed to articulate clear and convincing reasons to discount [Plaintiff's] symptom testimony, resulting in an RFC that does not account for all limitations shown by the record." (Doc. 11 at 5.) Plaintiff begins by explaining why his testimony as to two areas of limitation (*i.e.*, his right arm limitations and his limitations in interacting with others) would have been work-preclusive if accepted by the ALJ and incorporated into the RFC. (*Id.* at 5-6.) In a related vein, Plaintiff argues that the ALJ "failed to set forth a logical bridge" as to why the ALJ believed Plaintiff could occasionally use his dominant right upper extremity to perform strength-related tasks up to 10 pounds and could frequently use his dominant right upper extremity to perform strength-related tasks less than 10 pounds, which conflicted with Plaintiff's testimony that he could only use his dominant right arm to assist the left arm in a range of light work. (*Id.* at 7.) Turning to the ALJ's proffered reasons for discrediting his testimony, Plaintiff first argues that the ALJ's emphasis on the absence of "focal neurological deficits" was a red herring because his "complaints were related to his tendons rather than any nerve impingement until 2018"

and "[f]ocal neurological deficits are not a symptom of such injuries." (*Id.*)  Next, as for the ALJ's emphasis on his work as a tree climber and tree cutter, Plaintiff argues that "[a]n ALJ must be careful not to misconstrue a Plaintiff's daily activities as more than they are" and that "[t]he mention of working for an employer who cuts trees doing unknown work for an unknown amount of time per week . . . does not meet the clear and convincing standard." (*Id.* at 8-9.)  Next, as for his mental limitations, Plaintiff argues that "the ALJ has not explained why the record does not support [his] assertion that the *quality* of his social interaction, in addition to the *quantity* of his interactions, have been limited. . . . [R]egardless of the quantity of interaction with others, [Plaintiff] cannot sustain appropriate interactions on a regular and continuing basis and would behave inappropriately an unacceptable amount of times per month." (*Id.* at 9.)  Next, as for the "discrepancy between statements that [Plaintiff] made to La Frontera providers in 2016 that he was experiencing hallucinations and a contemporaneous denial of hallucinations to a Social Security consultative examiner," Plaintiff argues that (1) "[i]t is unclear the significance of this discrepancy on the relative strength of [his] statements about the intensity, persistence, and limiting effects of his symptoms"; (2) he had no motive to deny the existence of symptoms when being interviewed by a consultative examiner; and (3) in light of his later diagnosis of paranoid personality disorder, the "more likely" explanation for the discrepancy is that he distrusted the consultative examiner and thus was unwilling to share the details of his condition.  (*Id.* at 9-10.)  Next, as for the ALJ's emphasis on his "break in treatment between 2018 and 2020," Plaintiff argues that this should not be viewed as discrediting because it is a symptom of his paranoid personality disorder, which "leads him to distrust others, a distrust that includes medical professionals." (*Id.* at 10.)  Finally, as for the ALJ's emphasis on his ability to "get[] along with coworkers in December 2020," Plaintiff argues that a "short-lived job that [he] did not maintain for more than a few months is not clear and convincing evidence that he could maintain acceptable performance on a regular and continuing basis, or that he could have for the entire period at issue.  It is common for mental disorders to wax and wane in the course of treatment . . . ." (*Id.* at 11.)

The Commissioner disagrees and defends the sufficiency of the ALJ's reasoning. (Doc. 17 at 2-11.)  As for Plaintiff's shoulder-related limitations, the Commissioner argues that the ALJ permissibly discounted Plaintiff's testimony in light of its inconsistency with the objective medical evidence (which showed that Plaintiff experienced "dramatic improvement" following his first shoulder surgery in 2015 and received trigger point injections following his second surgery in 2018), with Plaintiff's work as a landscaper, pressure washer, and tree climber and trimmer, and with the observations during Plaintiff's consultative examination.  (*Id.* at 4-7.)  As for Plaintiff's social interaction limitations, the Commissioner argues that the ALJ permissibly discounted Plaintiff's testimony in light of its inconsistency with Plaintiff's work activity (which showed he was able to get along with coworkers), with Plaintiff's "largely normal" mental status examinations and other objective medical evidence, and with the conflicting opinions of Dr. Christiansen and the state agency medical consultants.  (*Id.* at 7-8.)  The Commissioner also argues that it was permissible for the ALJ to discredit Plaintiff's credibility based on his inconsistent statements regarding hallucinations and his lengthy break in pursuing treatment (which, according to the Commissioner, extended from 2015 to 2020).  (*Id.* at 9-10.)  Finally, the Commissioner defends the ALJ's RFC formulation.  (*Id.* at 10-11.)

In reply, Plaintiff argues that the ALJ "arbitrarily discredited" his symptom testimony; arbitrarily chose the right-arm restrictions set forth in the RFC; failed to explain why his work activity was inconsistent with his testimony; failed to explain how other medical providers' opinions supported the RFC; and failed to explain why the RFC should not contain the disabling limitations related to mental impairments that Plaintiff described. (Doc. 18 at 1-4.)

### 4.   Analysis

The Court finds no harmful error in the ALJ's evaluation of Plaintiff's symptom testimony.  One the ALJ's proffered reasons for the adverse credibility finding was that Plaintiff had made inconsistent statements about experiencing auditory hallucinations: "[T]here was a conflict in the claimant's report to La Frontera of auditory hallucinations

and the claimant's denial of same to a consultative examiner." (AR at 848.) Under Ninth Circuit law, this is a permissible reason for discrediting a claimant's testimony. *See, e.g., Tommasetti*, 533 F.3d at 1039 ("The ALJ may consider many factors in weighing a claimant's credibility, including . . . prior inconsistent statements concerning the symptoms . . . ."). Indeed, in *Hirtzel v. Kijakazi*, 2022 WL 2800820 (9th Cir. 2022), the Ninth Circuit found that "the ALJ fulfilled her obligation to provide 'specific, clear and convincing reasons' for discounting Hirtzel's subjective complaints" because "Hirtzel made inconsistent statements about her symptoms . . . , including affirmative denials of having any hallucinations." *Id.* at *1.

The ALJ's finding of inconsistency was supported by substantial evidence. On October 6, 2015, Plaintiff told a nurse practitioner at La Frontera that he had experienced "flashbacks" and "AH [auditory hallucinations] of father's voice." (AR at 431.) However, during a September 6, 2016 interview with the consultative examiner, Plaintiff "denied any history of hearing or seeing things other people don't." (*Id.* at 418.) Although Plaintiff attempts to provide a benign explanation for these inconsistent statements (*i.e.*, he didn't trust the consultative examiner and thus didn't feel comfortable sharing the full extent of his symptoms), it was rational for the ALJ to conclude otherwise. *See, e.g., Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) ("When evidence reasonably supports either confirming or reversing the ALJ's decision, we may not substitute our judgment for that of the ALJ.") (citation omitted); *Thomas*, 278 F.3d at 954 ("Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld.") (citation omitted).[2]

Another of the ALJ's proffered reasons for the adverse credibility finding was that Plaintiff's description of his physical limitations was inconsistent with Plaintiff's work history and daily activities. (*See, e.g.*, AR at 848 ["Despite his complaints of shoulder pain,

---

[2]    The report from the consultative examiner indicates that Plaintiff revealed many other sensitive details during the interview, including abuse he endured as a child and a suicide attempt. (AR at 417-18.) Plaintiff does not explain why his mental disorder would have enabled him to share such details with the consultative examiner but forced him to falsely deny the existence of auditory hallucinations.

as of December 2020 and early 2021, the claimant was getting along with coworkers in his job as a tree climber."]; *id.* at 850 ["As of early 2021, the claimant's symptoms were well managed . . . [and he] continued to work as a tree climber. . . .  In May 2021, the claimant . . . was still working as a tree cutter."]; *id.* at 844 ["It is noted that the claimant reported to a provider that he is 'unemployed officially' but did side constructions jobs.  He reported in August 2020, that he had begun a landscaping job on a full-time basis, which he enjoyed.  In early 2021, the claimant reported that he was working as a tree climber."].)  This, too, is a permissible reason under Ninth Circuit law for discrediting a claimant's testimony.  *Molina v. Astrue*, 674 F.3d 1104, 1112-13 (9th Cir. 2012) ("[T]he ALJ may consider inconsistencies . . . between the testimony and the claimant's conduct . . . and whether the claimant engages in daily activities inconsistent with the alleged symptoms. . . .  Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment.") (cleaned up); *Fry v. Berryhill*, 749 F. App'x 659, 660 (9th Cir. 2019) ("The ALJ proffered specific, clear, and convincing reasons for discounting Fry's testimony concerning the severity of her symptoms, including inconsistencies between her daily activities and alleged limitations . . . .").

The ALJ's finding of inconsistency was supported by substantial evidence.  During the hearing, Plaintiff testified that the "primary problems" caused by his shoulder impairment were "bad range of motion, not very much hand strength either anymore."  (AR at 877.)  As for the range-of-motion issue, Plaintiff testified that he would be unable, with his right hand, to reach up and get an item off a top shelf.  (*Id.* at 878.)  Plaintiff also testified that he would be unable, with his right hand, to place a gallon of milk on a table in front of him.  (*Id.* at 879.)  As for the hand-strength issue, Plaintiff testified: "It's like it goes numb, like my hand goes numb and I can't squeeze anything.  I've dropped numerous cups.  You know, it's like I don't feel anything in my hands."  (*Id*. at 878.)  However, Plaintiff reported in July 2020 that he was "[w]orking construction" (*id.* at 1109); reported in August 2020 that he had "[s]tarted a new job landscaping full time, enjoys it" (*id.* at

1057); reported in December 2020 that he was "[w]orking for tree climber" (*id.* at 1122); reported in February 2021 that he was "[s]till working as a tree[] climber and trims them" (*id.* at 1076); and reported in May 2021 that he "[s]till works as a tree cutter" (*id.* at 1128). It was permissible for the ALJ to conclude that Plaintiff's ability to engage in such work activities, which can be rationally construed as requiring the use of the arms and shoulders, was inconsistent with Plaintiff's extreme description of his right shoulder-related limitations. *See, e.g., Williams v. Berryhill*, 2017 WL 2727100, *4 (D. Or. 2017) ("An ALJ may reject a claimant's allegations when they are inconsistent with his reported activities, even if he has some difficulty completing those activities.  Here, the ALJ noted that plaintiff was able to perform extensive yard work and help a friend with construction work. . . .  These activities reasonably indicate that plaintiff was less impaired than alleged in his testimony, and the ALJ's . . . rejection of plaintiff's testimony was rational.") (citations omitted); *Neff v. Colvin*, 2014 WL 1247718, *3 (W.D. Wash. 2014) (concluding that "the ALJ offered clear and convincing reasons for failing to credit fully plaintiff's testimony" in part because the plaintiff's "work . . . as a construction worker [was] inconsistent with alleged level of incapacity").

It should be noted that upholding an adverse credibility finding in this circumstance does not, as Plaintiff suggests (Doc. 11 at 9), result in "disability claimants [being] penalized for attempting to lead normal lives in the face of their limitations." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998).  The Ninth Circuit has specifically recognized that "[i]nconsistencies between a claimant's testimony and the claimant's reported activities provide a valid reason for an adverse credibility determination." *Burrell v. Colvin*, 775 F.3d 1133, 1137-38 (9th Cir. 2014).  *See also Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001) (recognizing that a "tendency to exaggerate" is a "specific and convincing reason[]" for discrediting a claimant's testimony).

Because the ALJ identified multiple clear and convincing reasons, supported by substantial evidence, for discrediting Plaintiff's symptom testimony, it is unnecessary to resolve Plaintiff's objections to the additional rationales the ALJ offered for discrediting

his testimony.  Any error as to those additional rationales was harmless.  *See, e.g., Molina*, 674 F.3d at 1112-13 ("[S]everal of our cases have held that an ALJ's error was harmless where the ALJ provided one or more invalid reasons for disbelieving a claimant's testimony, but also provided valid reasons that were supported by the record."); *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1162-63 (9th Cir. 2008) ("Because we conclude that two of the ALJ's reasons supporting his adverse credibility finding are invalid, we must determine whether the ALJ's reliance on such reasons was harmless error. . . .  [T]he relevant inquiry in this context is not whether the ALJ would have made a different decision absent any error, it is whether the ALJ's decision remains legally valid, despite such error. . . .  Here, the ALJ's decision finding Carmickle less than fully credible is valid, despite the errors identified above.").  Additionally, because Plaintiff's only basis for challenging the RFC formulation is that the ALJ should have credited his testimony— an argument the Court has now rejected—Plaintiff is not entitled to reversal on that basis, either.  *Sayer v. Kijakazi*, 2022 WL 1153944, *1 (9th Cir. 2022) ("Because the ALJ permissibly weighed Sayer's testimony, Sayer's challenges to the ALJ's residual functional capacity determination likewise fail.").

Accordingly,

**IT IS ORDERED** that the decision of the ALJ is **affirmed**.  The Clerk shall enter judgment accordingly and terminate this action.

Dated this 5th day of October, 2023.

_____
Dominic W. Lanza
United States District Judge